UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL C. CHARBONEAU

                Plaintiff,                CIVIL ACTION NO. 05-CV-74608-DT

        vs.                     DISTRICT JUDGE DENISE PAGE HOOD

COMMISSIONER OF              MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                Defendant.
_____/


REPORT AND RECOMMENDATION

I.      RECOMMENDATION

      This Court recommends that  Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 18), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 14), and his complaint be **DISMISSED**.

II.     PROCEDURAL HISTORY

      This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act.  42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

      Plaintiff Michael C. Charboneau filed an application for Disability Insurance Benefits (DIB) on April 15, 2002.  (Tr. 48-53).  He alleged he had been disabled since January 1, 2001 due to severe back pain, unsuccessful back surgery, herniated discs, and right/left hand impairments.  (Tr. 37, 50). Plaintiff's claim was initially denied by a notice dated August 12, 2002. (Tr. 31-35).  Plaintiff sought a review hearing before an Administrative Law Judge (ALJ).  (Tr. 36).  A hearing took place before ALJ Regina Sobrino on April 1, 2004.  (Tr. 409-436).  Plaintiff was represented at the hearing.  (Tr. 45-47, 409). The ALJ denied Plaintiff's claims in an opinion issued on May 22, 2004. (Tr. 17-26).  The Appeals

Council denied review of the ALJ's decision on September 30, 2005 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 1-11). Plaintiff appealed the denial of his claim to this Court, and both parties have filed motions for summary judgment.

## III.   MEDICAL HISTORY

### A.   Plaintiff's Hand Impairments

In March 2000 Plaintiff was examined by Dr. Michael E. Holda, an orthopedic surgeon, regarding complaints of bilateral hand pain. An examination revealed that Plaintiff's first carpal-metacarpal ("CMC") joints in both thumbs were tender and painful upon motion. (Tr. 302). Subsequent x-rays of Plaintiff left hand showed arthritic changes at the first CMC joint, indicative of degenerative arthritis. *Id.* Dr. Holda prescribed Vicodin for Plaintiff's pain and referred him to Dr. Mark A. Wilson, an orthopedic hand surgeon, for consultation. *Id.*

Dr. Wilson examined Plaintiff's hands in April 2000. He noted that Plaintiff had a decreased range of motion ("ROM") in Plaintiff's right and left thumb CMC joints, instability, and limited thenar strength. (Tr. 257). X-rays showed advanced bilateral CMC arthritis and left thumb deformity. *Id.*

Plaintiff underwent surgery to treat his bilateral CMC arthritis. In May 2000 Dr. Wilson performed an arthrodesis with plate and screw fixation and a distal radius bone graft on Plaintiff's left thumb. (Tr. 110-11). In May 2001 Dr. Wilson performed a similar surgery on Plaintiff's right thumb. (Tr. 107-09).

Post-operative problems arose as to both of Plaintiff's thumbs, which required further surgical intervention. In September 2001 Dr. Michael Fitzsimmons performed a revision on Plaintiff's right thumb CMC joint using an iliac crest bone graft. (Tr. 198-99). Plaintiff was reportedly "doing better with less pain" in his right thumb by November 2001. (Tr. 190). However, examination of Plaintiff's left thumb CMC joint showed instability and degenerative changes. One of the screws in Plaintiff's

fusion site had broken and there was nonunion of the fusion site. *Id.* In January 2002 a revision was performed on Plaintiff's left thumb CMC joint. It was estimated that Plaintiff would be off of work for five months. (Tr. 190-93). Plaintiff saw Dr. Wilson for a follow-up appointment in late January. Dr. Wilson noted that he believed Plaintiff's smoking was contributing to the nonunion of his fusion site. (Tr. 231). Plaintiff subsequently reported that he had stopped smoking. (Tr. 229-30).

In February 2002 Dr. Wilson wrote a letter indicating that Plaintiff would have "permanent stiffness in the thumbs" and that Plaintiff could not use his thumbs in the "normal mechanical fashion for repetitive manual-type work." (Tr. 228). Plaintiff reported to Dr. Wilson in March 2002 that his left thumb was not hurting as much. (Tr. 226). Dr. Wilson reported that Plaintiff's left thumb CMC joint was stable with no sign of neurovascular compromise. There was some tenderness but Dr. Wilson was "happy with the results." *Id.* X-rays showed good healing and fusion. *Id.* Dr. Wilson also noted that Plaintiff was going to visit his sick uncle in Florida and he did not prescribe any narcotic medication.[1]

In an undated record, Dr. Wilson noted that Plaintiff had a loss of grip strength in his right, dominant hand and that Plaintiff's hands retained 75% of their strength. (Tr. 225). He also wrote that Plaintiff had a loss of fine dexterity in both hands. *Id.* Specifically, he noted that Plaintiff could not open a jar or pick up small objects with his hands but he could button his clothing and hold a pencil. *Id.* Dr. Wilson noted that Plaintiff could write legibly with his right, dominant hand but not with left hand. *Id.* Dr. Wilson further concluded that Plaintiff had a loss of gross dexterity and was unable to forcefully grip, grasp, or twist items. *Id.*

---

[1]      Dr. Wilson commented that Plaintiff was abusing his prescribed narcotics. At the time, Dr. Wilson indicated that he would not call in any more prescriptions for Plaintiff. Similar notations were made by other doctors throughout the medical record. (Tr. 169-70, 226, 235, 250, 252, 261-62, 281-83). Despite these concerns, Plaintiff's prescriptions for narcotic drugs were refilled on many other occasions when deemed medically necessary.

The record also contains opinion evidence from Dr. Gary King, Plaintiff's treating general health physician, and Dr. Holda about the limitations associated with Plaintiff's hand impairments. Dr. King opined that Plaintiff had moderate limitations in his ability to use either hand for fine manipulations and in his ability to use his left hand for grasping, turning, and twisting objects. However, Dr. King did not believe that Plaintiff's fine dexterity was totally precluded. (Tr. 277, 289-90.) Dr. Holda, on the other hand, opined that Plaintiff's various impairments, including those associated with his hands, rendered Plaintiff "unable to work", "permanently disabled", and unable to lift or carry any weight or to use his hands for manipulative tasks. (Tr. 340-41.)

### B.   Plaintiff's Back Impairments

Dr. Holda also examined Plaintiff in October 2000 for complaints of pain in his lower back, right hip, and right leg. (Tr. 301). A straight leg raising test was positive on the right at 90 degrees but negative on the left. Plaintiff's sensations were intact and his reflexes were 2+. He had full ROM upon flexion, extension, and side-bending with pain reported only at the extremes. No lumbar tenderness or muscle spasms were noted. *Id.* X-rays of Plaintiff's lumbar spine showed narrowing at L4-L5 and L5-S1 with anterior spur formation. *Id.* Dr. Holda diagnosed Plaintiff with lumbar radiculopathy. *Id.*

Plaintiff was thereafter referred to Dr. Barry Landau, a neurosurgeon, for evaluation. In January 2001 Plaintiff reported to Dr. Landau that he experienced radiating pain in his right hip with numbness and tingling. Plaintiff also stated that his pain increased with sitting, weight bearing, and lying down. (Tr. 118). Examination showed a positive straight leg raising test on the right, an antalgic gait, mildly diminished sensation throughout the entire dorsal aspect of the foot, and severely diminished sensation to light touch and pinprick over the foot and heel along the path of the S1 nerve root. (Tr. 118-19). A subsequent MRI showed that Plaintiff had a herniated disc and lumbar stenosis at L4-L5 and L5-S1. (Tr. 123).

As a result of the MRI findings, Dr. Landau performed a right L5-S1 discectomy and a right L4-L5 laminotomy and decompression surgery on January 29, 2001. (Tr. 125-26). Despite the surgery, Plaintiff's reports of radiating right hip and leg pain continued. (Tr. 113-15). Plaintiff was prescribed various medications for his pain. *Id.* Another MRI was taken in March 2001 which showed recurrent disc herniation with disc bulging and borderline canal stenosis at L5-S1 and spondylosis with disc bulging at L4-L5. (Tr. 121).

Plaintiff reported to Dr. Landau in April 2001 that his low back pain had "gone" but that he had occasional sharp pains radiating from his hip to his right calf that increased with sitting for more than 20 minutes. (Tr. 303). An examination showed that Plaintiff had a positive straight leg raising test at 90 degrees and decreased sensation over the lateral right foot. *Id.* Dr. Landau prescribed physical therapy and medication. *Id.* Plaintiff was also seen by Dr. King in July 2001 regarding his back pain. Dr. King noted that Plaintiff had a mildly positive straight leg raising test on the right. He commented that Plaintiff would likely have some chronic back pain that he would need to live with and that Plaintiff should return to work as soon as possible. (Tr. 284). Dr. King saw Plaintiff in October, November, and December 2001 for the same pain and examination findings remained unchanged.

Plaintiff began treatment with Dr. Mokbel Chedid, a neurosurgeon, in December 2001 for his continuing complaints of leg and lower back pain. (Tr. 264). Plaintiff had a positive straight right leg raising test at 30 to 60 degrees, depending upon when he was examined, and mild weakness with a right-sided limp. He also had lower back tenderness with limited bending and pain upon the straightening of the back. No muscle atrophy or tone loss were noted. (Tr. 265). Dr. Chedid diagnosed Plaintiff with low back pain and degenerative disc disease. (Tr. 266). He recommended that Plaintiff have an electromyogram ("EMG") and a myelogram. *Id.*

An EMG from December 2001 showed L5 root irritation consistent with degenerative disc disease or post-surgical scar tissue. (Tr. 276). A CT scan from January 2002 showed narrowing of the disc space at L4-L5 and severe narrowing of the disc space at L5-S1, which was confirmed by a myelogram. (Tr. 163-64). Dr. Chedid subsequently ordered a discogram in April 2002. The discogram showed marked disc degeneration at L4-L5 with a pain reaction of 6 out of 10 in severity and marked disc generation at L5-S1 with a pain reaction of 8 out of 10 in severity. The discogram was interpreted to correlate with Plaintiff's normal reported pain at L4-L5 but not at L5-S1. (Tr. 139-40). Another CT scan from April 2002 showed an annular tear at L3-L4 and marked degeneration at L4-L5 and L5-S1. (Tr. 141-42).

On May 9, 2002 Dr. King was asked to fill out a Multiple Impairment Questionnaire for Plaintiff's attorney. On that form, Dr. King noted that Plaintiff had recurrent back pain secondary to herniated discs as confirmed by MRI scans and a discogram. Dr. King opined that Plaintiff could sit for up to 8 hours in an 8-hour workday with 5 minute rests every hour and could stand/walk for up to two hours. (Tr. 288-89).

On May 10, 2002 Dr. Chedid wrote to Dr. King, stating that he had discussed with Plaintiff the option of having another decompression back surgery and that Plaintiff was considering his options. (Tr. 261). Sometime thereafter, Dr. King filled out a disability assessment form stating that Plaintiff could stand/walk for 6 to 8 hours in an 8-hour workday with brief hourly rests and could sit for 2 hours in an 8-hour workday with hourly movement to stretch and walk.[2] (Tr. 277-79). He also estimated that Plaintiff's level of pain was moderate but completely relieved by medication without unacceptable side effects. (Tr. 288). Dr. Holda also noted that Plaintiff would need to take unscheduled breaks at

_____

[2] This form is undated but references a letter from an unnamed neurosurgeon dated 5/10/02.

unpredictable intervals once or twice a day and that Plaintiff may have "bad days" requiring more than 3 absences from work per month due to his impairments or treatment. (Tr. 291-92).

Plaintiff returned to Dr. Chedid in June 2002. An examination showed a positive straight leg raising test, mild weakness in Plaintiff's lower extremities, diminished reflexes, a mild limp, and limited lumbar ROM. (Tr. 166). Dr. Chedid again discussed the back surgery with Plaintiff. He noted that Plaintiff had previously failed medical management and had not stopped smoking. Plaintiff was also overdosing on Vicodin. Dr. Chedid informed Plaintiff that his Vicodin abuse and continued smoking could harm his chances of recovery from surgery. Plaintiff stated that he understood but still wanted to have the back surgery. (Tr. 169-171). Dr. Chedid thereafter performed a bilateral laminotomy and foraminotomy with discectomy and lumbar fusion at L4-L5. *Id.* Plaintiff was hospitalized for four days and then released. (Tr. 166).

In August 2002 Plaintiff's medical record was reviewed by a state agency physician. The physician concluded, in part, that Plaintiff could: (1) lift and/or carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk or sit for about 6 hours in an 8-hour workday; (3) occasionally climb, stoop, kneel, crouch, and crawl; (3) frequently balance; (4) frequently reach, hand, and finger with both hands; and (5) constantly feel. He also noted that Plaintiff should avoid even moderate exposure to vibration. (Tr. 96-103).

Plaintiff was seen by Dr. Holda in September 2002 complaining of right hip pain after a fall. (Tr. 295). He ambulated with a antalgic gait and had a restricted ROM. There was no swelling but some tenderness noted. Plaintiff's sensation to light touch remained unaffected. Dr. Holda's examination revealed similar findings in October 2002 but it was noted that Plaintiff had strong muscles, a positive straight leg raising test at 90 degrees, and 2+ reflexes. (Tr. 294). Dr. Holda reported that he believed Plaintiff was permanently unable to work due to his back pain. *Id.* Dr. Holda also filled out a Lumbar

Spine Questionnaire on October 20, 2002.  He noted that Plaintiff's back impairment likely rendered

him permanently disabled, citing to Plaintiff's antalgic gait and positive straight leg raising test at 90

degrees.  Dr. Holda provided no specific limitations with regard to Plaintiff's ability to sit/stand/walk

other than to remark that Plaintiff was unable to work.  (Tr. 311-17).

Dr. Holda continued to see Plaintiff for his back pain between March 2003 and March 2004 on

a monthly basis.  Examination findings noted tenderness and positive straight leg raising tests on the

right at 90 degrees in the seated position.  (Tr. 352-64).  Reflexes were 2+ and symmetrical and sensation

to light touch was maintained.  *Id.*  The records show that Plaintiff's gait alternated between antalgic and

normal.  *Id.*  Dr. Holda prescribed medication and recommended that Plaintiff do home exercises.  *Id.*

In March 2002 Dr. Holda noted that Plaintiff did not want to have any more physical therapy or surgery.

(Tr. 352).  On March 8, 2004 Dr. Holda filled out a Multiple Impairments Questionnaire opining that

Plaintiff was "permanently disabled" and "unable to work." (Tr. 338-341).

## IV.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff was 46 years old when he testified before the ALJ and he had a 12th grade

education.  (Tr. 413).  Plaintiff testified that he could only stand for 20 minutes before needing to sit

down and walk for about 20 minutes before needing to stop.  (Tr. 416-17).  He indicated that he

used a cane when his pain got "really bad" but a doctor had not prescribed it.  (Tr. 417).  Plaintiff

also stated that he could sit in a chair for 20 minutes before he needed to stand up because his right

leg would become painful and start to shake.  *Id.*  He estimated that he could lift 10 pounds but it

hurt his back and hands to lift any more.  (Tr. 417-18).  Plaintiff testified that he had problems

using his left hand to hold a pen or pick up coins and that since his accident he could write with his

right hand but not very well.  (Tr. 418).  He could grasp a gallon of milk by the handle and take it to

-8-

a table with his right hand but he did not believe he could do so with his left hand.  (Tr. 426-27).

Plaintiff stated that he had trouble reaching up over his head and reaching out due to lower back

problems.  (Tr. 418).   Plaintiff informed the ALJ that he had difficulty bending from the spine so he

used his knees to crouch down instead.  (Tr. 419).  He climbed down stairs slowly using a handrail.

*Id.*  Generally, Plaintiff would sit in the reclined position for about 8 hours a day to relieve his leg

and back pressure, which was comfortable but not medically necessary.  (Tr. 427-28).  Plaintiff also

told the ALJ that 3 or 4 times a week were "bad days" during which he would lie in bed for a couple

of hours then get up to walk around before reclining in his chair to watch television or listen to the

radio.  (Tr. 428-29).

Plaintiff's girlfriend did most of the cooking, cleaning, and laundry although he tried to help

by dusting and heating up food.  (Tr. 419).  Plaintiff did no grocery shopping because it was difficult

to get around.  *Id.*  He had two dogs but he did not take them for walks.  Rather, he let them run

around his 3 acres of property.  (Tr. 420).  Plaintiff told the ALJ that he had trouble bathing and

dressing himself, especially with buttoning his shirts, tying his shoelaces, and holding a bar of soap.

(Tr. 420-21).  He used a riding lawn mower to cut grass but could only do so for 20 minutes.  (Tr.

421).  He would drive a car to friends' houses or to the store but would not go very far.  (Tr. 420-

21).  Plaintiff also testified that he had taken a trip to Florida in 2002.  (Tr. 422).

Plaintiff further stated that he took Vicodin and Soma.  These medications were helpful but

they made him sleepy.  (Tr. 422).  Plaintiff said that his doctor had not changed his prescription

although he knew the medication made Plaintiff drowsy.  (Tr. 423).

### B.   Vocational Expert's Testimony

Melody Henry, a certified rehabilitation counselor, testified as a vocational expert at

the hearing.      (Tr. 40, 429-35).  The ALJ asked Ms. Henry about the type and number of

jobs available in the regional or national economy for a hypothetical individual of Plaintiff's age, education, and work experience[3] who needed to alternate positions at will and who could; (2) stand and walk 2 hours in an 8-hour day; (3) sit for at least 6 hours in an 8-hour day; (4) lift 10 pounds frequently and 20 pounds occasionally using both hands; (5) carry 5 pounds frequently and 10 pounds occasionally using both hands; (6) push or pull 10 pounds frequently and 20 pounds occasionally using both hands; (7) never climb ladders, ropes, or scaffolds; (8) occasionally climb stairs; (9) rarely bend; (10) occasionally crouch; (11) never crawl; (12) never perform work involving forceful gripping, grasping, pinching, twisting, or squeezing; (12) frequently, but not constantly handle, finger, and reach; (13) never perform work operating foot or leg controls; and (14) never be exposed to vibration.  (Tr. 431).

Ms. Henry testified that in the light, unskilled area there were 12,500 cashier positions, 2,100 counter clerk positions, 2,000 rental clerk positions, and 4,550 general office clerk positions available for such a hypothetical individual.  (Tr. 432).  The ALJ then asked Ms. Henry what type and number of jobs would be available to the same hypothetical individual who was limited to unskilled, sedentary work.  Ms. Henry testified that there would be 23,545 cashier positions, 4,680 receptionist positions, 5,475 general office clerk positions, and 1,250 surveillance monitor positions.  (Tr. 431).

However, Ms. Henry also testified that the cashier and general office clerk positions at the light and sedentary level would be precluded for the same hypothetical if that individual could only occasionally, rather than frequently, handle and finger.  (Tr. 432).  She further testified that all unskilled work would be precluded if the same hypothetical individual as initially described was off

---

[3]       Ms. Henry had previously submitted a vocational analysis form in which she opined that Plaintiff's prior job as a door assembler/loader is categorized as very heavy, unskilled work. This form was made part of the record during the hearing.  (Tr. 95, 430).  Ms. Henry also testified that Plaintiff's testimony did not change her opinion regarding this issue.  (Tr. 430).

-10-

task for 1 to 2 hours per day due to pain interfering with his ability to concentrate or if that individual needed to lay down 1 to 2 hours per day.  (Tr. 433).

## V.    LAW AND ANALYSIS

### A.    STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  It is not the function of this court to  try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole.  *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently.  *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B.    FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)    he was not presently engaged in substantial gainful employment; and

-11-

      (2)     he suffered from a severe impairment; and

      (3)     the impairment met or was medically equal to a "listed impairment;" or

      (4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work. If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.

**C.**     **ANALYSIS**

After concluding that Plaintiff had not engage in any substantial gainful employment during the period of closed disability, the ALJ determined that Plaintiff had "severe" impairments consisting of degenerative spinal disc disease and degenerative joint disease of both thumbs, but that those impairments did not meet or equal a listed impairment. None of these findings are in dispute.

The ALJ also determined that Plaintiff had the Residual Functioning Capacity ("RFC") to: (1) lift, push, and pull 10 pounds frequently and 20 pounds occasionally, using both hands; (2) carry no more than 10 pounds occasionally and 5 pounds frequently, using both hands; (3) frequently, but not constantly, handle, finger, and reach; (4) stand/walk for 2 hours per 8-hour workday; (5) sit for 6 hours per 8-hour workday; (6) occasionally climb stairs and crouch; and (7) rarely stoop. However, Plaintiff needed to be able to alternate his position at will. He also could not: (1) crawl or climb ladders, scaffolds, or ropes; (2) forcefully grip, grasp, pinch, twist, or squeeze; (3) be exposed to vibration; and (4) operate leg or foot controls. (Tr. 24, 25). Based upon the testimony of the VE that a hypothetical individual of Plaintiff's age, education, work history, and RFC could perform a significant number of jobs in the regional economy, the ALJ determined that Plaintiff was not disabled. Plaintiff challenges

-12-

2:05-cv-74608-DPH-MKM   Doc # 22   Filed 01/16/07   Pg 13 of 22   Pg ID 547

the ALJ's RFC finding to the extent it is inconsistent with some of his treating physicians' opinions and with his subjective complaints.

1.   <strong><u>Treating Physician's Doctrine</u></strong>

Plaintiff argues that the ALJ erroneously crafted this RFC finding because he failed to incorporate the medical opinions of his treating physicians, Dr. King, Dr. Wilson, and Dr. Holda, in violation of 20 C.F.R. § 404.1527(d)(2). As the Sixth Circuit stated in *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997), "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimant's only once." Indeed, 20 C.F.R. § 404.1527(d)(2) provides that a treating source's opinion regarding the nature and severity of a claimant's condition is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. However, an ALJ is not bound by a treating physician's opinion if that opinion is not supported by sufficient clinical findings or is otherwise inconsistent with other substantial evidence in the record. *See Walters*, 127 F.3d at 530. But, if an ALJ rejects a treating physician's opinion on the issues of the nature and severity of a claimant's impairments, he must "give good reasons" for doing so in his written opinion." 20 C.F.R. § 404.1527(d)(2); see also SSR 96- 5p. The ALJ need not, however, "give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ." 20 C.F.R. § 404.1527(e)(3). One such issue is "the determination or decision about whether you meet the statutory definition of disability." 20 C.F.R. § 404.1527(e)(1).

Plaintiff concedes that the ALJ's RFC finding properly incorporated Dr. King's opinion rendered on May 9, 2002 that Plaintiff had the ability to sit for 6 hours and to stand/walk for 2 hours in an 8-hour workday. Nevertheless, Plaintiff argues that the ALJ should have instead adopted Dr. King's subsequent opinion that Plaintiff only had the ability to sit for 2 hours (with hourly movement

-13-

to stretch and walk around)  and to stand/walk for 6 to 8 hours (with brief hourly rests) in an 8-hour workday.  (Tr. 277-79).  Dr. King did not provide a specific reason for his second opinion in which juxtaposed his findings regarding the amount of time he estimated Plaintiff could sit and stand or walk. However, he did reference a letter from a neurosurgeon dated May 10, 2002.  The only letter from a neurosurgeon bearing such date was from Dr. Chedid, which discussed Plaintiff's contemplated second back surgery.

The ALJ did not discuss why she favored Dr. King's first opinion regarding Plaintiff's ability sit, stand, and walk but the Court concludes that the ALJ's decision to resolve the conflict in the manner which she did was not erroneous.  Dr. King was aware of the results of Plaintiff's lumbar MRI and discogram when rendering both of his opinions.  Dr. Chedid's letter to Dr. King did not discuss specific limitations in Plaintiff's exertional capabilities or note any changes in Plaintiff's condition that could have prompted Dr. King's change in opinion.  Rather, it only noted that surgery was being contemplated.  Moreover, Dr. King's first opinion was consistent with that of the state agency physician rendered in August 2002.  20 C.F.R. § 404.1527(f)(2)(I) (state agency physician are "highly qualified physicians . . . who are also experts in Social Security disability evaluations.").  Therefore, substantial evidence supports the ALJ's determination that Plaintiff could sit for 2 hours and stand/walk for at least 6 hours in an 8-hour workday.

Plaintiff also asserts that the ALJ improperly failed to defer to Dr. King's other opinions that Plaintiff: (1) needed to get up from the seated position hourly and to not sit again for 5 minutes; (2) required unscheduled breaks 1-2 times per day; and (3) would miss work more than 3 times per month due to his impairments or treatment.  The ALJ's RFC finding was entirely consistent with Dr. King's opinion that Plaintiff needed to change positions hourly and not sit again for 5 minutes because the ALJ included a limitation that would allow Plaintiff to alternate positions at-will.  Therefore, no error

-14-

occurred.  Furthermore, Dr. King did not provide any explanation for why he believed Plaintiff would need unscheduled breaks once or twice a day or would be absent from work more than 3 times a month due to his impairments or treatment.  Plaintiff points to no objective evidence in Dr. King's questionnaire or in his treatment notes suggesting why Plaintiff's impairments would necessitate such restrictions.  Therefore, the ALJ did not err by refusing to defer to Dr. King's unsubstantiated opinions.

Plaintiff also contends that the ALJ failed to explain why rejected Dr. King's opinion that Plaintiff had moderate limitations in his ability to use either hand for fine manipulation and his left hand for grasping, turning, and twisting objects and Dr. Wilson's opinion that Plaintiff could not use his thumbs "in normal [*sic*] mechanical fashion for repetitive manual-type work."

The ALJ's RFC finding that Plaintiff could not forcefully grip, grasp, pinch, twist, or squeeze is more restrictive than Dr. King's opinion, which limited Plaintiff only with regard to his left hand, and is fully consistent with Dr. Wilson's opinion.  The ALJ's finding is also not clearly inconsistent with Dr. King's opinion that Plaintiff was moderately, but not totally, precluded from using his hands for fine manipulation.  Therefore, their opinions in this regard were not rejected by the ALJ and no further discussion was necessary.

Furthermore, it is clear from the ALJ's written opinion that she found Dr. Wilson's statement that Plaintiff could perform work that did not involve "repetitive, manual-type labor" to be consistent with her RFC finding in that she relied upon it reject Dr. Holda's opinion, discussed below, that Plaintiff was totally disabled.  The ALJ's conclusion was reasonable in light of Dr. Wilson's additional comment that Plaintiff was only permanently disabled from doing his "normal type of work," which Dr. Wilson had previously noted involved making doors and which the VE opined was very heavy labor.  (Tr. 228, 256).  To the extent Dr. Wilson's opinion was inconsistent with the ALJ's RFC finding, the ALJ properly weighed that opinion against those of Dr. King, who described Plaintiff's limitations as only

-15-

moderate, and of the state agency physician who concluded that Plaintiff could frequently, but not constantly, finger objects.

Plaintiff further asserts that substantial evidence does not support the ALJ's decision to reject Dr. Holda's opinion that Plaintiff was unable to work and was permanently disabled. No error occurred as a result of the ALJ's failure to adopt Dr. Holda's opinion that Plaintiff was permanently disabled. Such an opinion did not concern the nature or severity of Plaintiff's impairments. Rather, it was an opinion on an issue reserved to the Commissioner and was entitled to no "special significance." 20 C.F.R. § 404.1527(e)(1), (3).

Furthermore, the ALJ provided reasons for rejecting Dr. Holda's opinion, which are supported by substantial evidence. The ALJ first noted the extremity of Dr. Holda's opinion wherein he concluded that Plaintiff *completely* lacked the ability to sit, stand, and walk.[4] The ALJ then properly commented that this opinion was contradicted by Plaintiff's own description of his abilities. The ALJ cited to Plaintiff's ability to take a trip to Florida in 2002 to visit his sick uncle and Plaintiff's statement in May 2002 that he could walk 1 mile in 25 minutes. (Tr. 82, 266, 422). The ALJ also noted earlier in her written opinion that Plaintiff testified to being able to sit/stand/walk for 20 minutes at a time before needing to change positions. (Tr. 21, 416-17). She also commented upon Plaintiff's activities of daily living including his ability to drive, operate a riding lawn mower, visit with friends and family, do light household chores. Further, the ALJ noted that Dr. Holda's opinion was contradicted by Dr. King and Dr. Wilson who opined that Plaintiff, while limited, retained exertional, manipulative, and postural

---

[4]     Dr. Holda's opinion similarly remarked that Plaintiff was totally incapable of lifting/carrying and performing other postural and manipulative limitations, such as fingering, squatting, climbing, etc. To the extent the ALJ found these limitations consistent with the objective medical evidence and that of Plaintiff's other treating physicians, she incorporated them into her RFC finding. For example, the ALJ concluded that Plaintiff could not crawl or climb ladders, scaffolds, or ropes, forcefully grip, grasp, pinch, twist, or squeeze.

functioning.  It was also contradicted by the state agency physician, whose opinion the ALJ partially adopted.  The ALJ additionally noted that Dr. Holda's finding that Plaintiff could walk, albeit with an antalgic gait, and had strong leg muscles, was inconsistent with Dr. Holda's opinion that Plaintiff was completely unable to walk.  Based upon this evidence as a whole, the Court concludes the ALJ properly rejected Dr. Holda's opinion.

> **2.    Plaintiff's Credibility Regarding His Disabling Pain and Other Limitations**

Plaintiff also argues, without much discussion, that the ALJ erred by discounting his claims of disabling pain and by finding Plaintiff to be less than fully credible.  An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility.  *Walters, at* 531.  However, credibility assessments are not insulated from judicial review.  Despite deference due, such a determination must nevertheless be supported by substantial evidence.  *Id.*

With regard to Plaintiff's allegations of disabling pain, Social Security regulations prescribe a two-step process.  The plaintiff must show objective, medical evidence of an underlying medical condition and: (1) objective medical evidence to confirm the severity of the alleged pain rising from the condition; or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.  20 C.F.R. § 404.1529(b) (1995); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).  If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 20 C.F.R. § 404.1529(c) (1995); *Jones*, 945 F.2d at 1369-70.  In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate

-17-

the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id.*

The ALJ properly applied the above-regulations and made the following credibility assessment:

> The medical evidence documents the existence of impairments that can reasonably be expected to produce symptoms such as pain. However, the intensity, persistence and functionally limiting effects of the symptoms alleged by the claimant are not fully consistent with the objective medical evidence and other evidence of record.

(Tr. 23-24). The "other evidence" referred to by the ALJ included Plaintiff's medication being limited to Vicodin and Soma and Plaintiff's reported activities of daily living. Plaintiff's daily activities included mowing his 3-acre property on a riding lawnmower in 30 minute increments, light household chores, visits with friends and family, driving, and taking out the trash. (Tr. 21, 24). The ALJ also specifically rejected Plaintiff's assertion that his medication made him sleepy, citing to Plaintiff's ability to drive, the lack of treatment notes reflecting such an assertion, and Plaintiff's report in May 2002 that Vicodin did not cause side effects.[5]   (Tr. 21, 24). The ALJ also cited to the opinions of Dr. King, Dr. Wilson, and the state agency physician, who each described limitations that were inconsistent with Plaintiff's assertions of disabling pain.

Plaintiff does not challenge these factual findings nor does he challenge the ALJ's application of the law. Rather, Plaintiff points to isolated evidence that he asserts the ALJ ignored and which he contends undermines the ALJ's credibility determination. Specifically, Plaintiff refers to various reports of Dr. Landau that note Plaintiff's subjective reports of pain with sitting and lying down. (Tr. 113, 115, 118, 157, 303). Plaintiff also cites to the results of the discogram. (Tr. 140). Plaintiff does not explain how these facts undermine the ALJ's credibility determination. There is no requirement, however, that

---

[5]   The Court notes that the ALJ's finding is also supported by Dr. King's opinion that Plaintiff's pain was moderate but alleviated by medications with no side effects. (Tr. 288).

-18-

the ALJ must discuss every piece of evidence in the administrative record. *Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("a written evaluation of every piece of testimony and submitted evidence is not required"); *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987) (ALJ need only articulate his rationale sufficiently to allow meaningful review). Moreover, Dr. Landau's reports to which Plaintiff refers document nothing more than Plaintiff's subjective complaints of pain. These complaints were otherwise duly noted by the ALJ in her written opinion. (Tr. 21). The ALJ also did not ignore the results of Plaintiff's discogram, which was followed by Plaintiff's back surgery in June 2002. (Tr. 22). Indeed, the ALJ acknowledged that Plaintiff's objectively documented impairments could cause pain but not necessarily to the extent of rendering Plaintiff functionally unable to perform the level of work consistent with her RFC finding. Given this evidence as a whole, the Court concludes that the ALJ properly analyzed Plaintiff's credibility and the ALJ's determination is supported by substantial evidence.

### 3.    Consistency Between the ALJ's RFC Finding and Rules/Regulations

Plaintiff also asserts that the ALJ's RFC finding, even if supported by substantial evidence, would not result in a significant number of jobs that Plaintiff could perform. (Pl.'s Mot. for Summ.J. at 19). Plaintiff alleges that the ALJ's RFC finding that Plaintiff could not stand/walk for more than 2 hours is inconsistent with the ability to do light work. 20 C.F.R. § 404.156(b); Social Security Ruling ("SSR") 83-10. Consequently, he argues that the VE's testimony regarding the availability of light work jobs for Plaintiff could not provide substantial evidence to support the ALJ's non-disability determination. Plaintiff's argument would have teeth if the ALJ had found Plaintiff capable of performing the *full range* of light work. However, the ALJ restricted Plaintiff to a range of light work that could accommodate, among other limitations, his ability to only stand/walk for 2 hours. The VE, being advised of the restricted range of light work via the hypothetical, testified that there were

nevertheless a significant number of light jobs that Plaintiff could perform. Plaintiff's argument to the contrary is meritless.

Similarly, Plaintiff contends that the ALJ's RFC finding that Plaintiff required a job with a sit/stand at-will option was inconsistent with the ability to do sedentary work. Therefore, the VE's testimony as to sedentary jobs that Plaintiff could perform in the regional economy also fails to provide substantial evidentiary support for the ALJ's non-disability determination. SSR 83-12.

A sit/stand at-will option is appropriate for persons who are "not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work." SSR 83-12, 1983 WL 31253 *4. Typically, this limitation is accommodated by managerial or professional jobs and less frequently by unskilled, structured jobs. Therefore, "[i]n cases of unusual limitation of ability to sit or stand, a VS [vocational specialist] should be consulted to clarify the implications for the occupational base." *Ibid.* The ALJ adhered to SSR 83-12 and sought such testimony from the VE, thus "clarif[ying] the implications for the occupational base." Therefore, no error occurred.

Lastly, Plaintiff contends that if Plaintiff had the RFC to only occasionally, rather than frequently, handle objects then there would not exist a significant number of jobs available in the regional economy for Plaintiff to perform. Specifically, he asserts that the only job that could accommodate a person with the ability to handle objects occasionally is that of video surveillance monitor based upon the VE's testimony and the information contained in the Dictionary of Occupational Titles ("DOT"). The ALJ did not find that Plaintiff had the RFC to perform only occasional handling so the issue is purely academic. A review of the transcript reveals that the VE testified that, her opinion, only the positions of cashier and general office clerk would be eliminated by

-20-

the change to occasional handling. (Tr. 432, 434). That would leave approximately 4,100 unskilled light jobs and 5,935 unskilled, sedentary jobs available in the regional economy.[6] Plaintiff does not argue that such a number is insignificant given the facts of this case. *See Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)(no "magic number" exists which differentiates between what constitutes a significant and an insignificant number of jobs); *Born v. Sec'y of Health & Human Srvs.*, 923 F.2d 1168, 1174 (6th Cir. 1990)(the determination of what constitutes significant numbers must be made by weighing the statutory language and applying it to a particular claimant's factual situation). Consequently, the Court finds that the ALJ's non-disability determination was supported by substantial evidence.

### E.   RECOMMENDATION

The Commissioner's decision is supported by substantial evidence. Defendant's Motion for Summary Judgment (Docket # 18) should be **GRANTED**. Plaintiff's Motion for Summary Judgment (Docket # 14) should be **DENIED** and his complaint should be **DISMISSED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

---

[6]      Plaintiff asserts that the receptionist position requires frequent handling of objects according to the DOT. The VE testified otherwise. Plaintiff did not challenge the VE's testimony at the hearing, which the VE stated was consistent with the DOT. (Tr. 432).

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 16, 2006        s/ Mona K. Majzoub
                                    **MONA K. MAJZOUB**
                                    **UNITED STATES MAGISTRATE JUDGE**

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 16, 2006        s/ Lisa C. Bartlett
                                    Courtroom Deputy